**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| In Re: **ALLEN C. BORSCHOW,** § | |
| **PATRICIA I. BORSCHOW,** § | |
| § | |
| **Debtors.** § | |
| § | |
| § | |
| **TURBO ALEAE INVESTMENTS, INC.,** § | |
| § | |
| **Appellant,** § | |
| § | |
| v. § | **EP-11-CV-248-KC** |
| § | |
| **ALLEN C. BORSCHOW, PATRICIA I.** § | |
| **BORSCHOW,** § | |
| § | |
| **Appellees.** § | |

## <u>ORDER</u>

On this day, the Court considered Allen C. Borschow and Patricia L. Borschow's appeal

from a final order of the United States Bankruptcy Court for the Western District of Texas.  Br.

of Cross-Appellants ("Debtors' Brief"), ECF No. 6.  The Court also considered Turbo Aleae

Investments Inc.'s competing appeal regarding the bankruptcy court's final judgment.  Turbo

Aleae Investments Inc.'s Opening Br. (Turbos's Brief"), ECF No. 7.

For the reasons set forth below, the Court **AFFIRMS** the bankruptcy court's rulings.

## I.     BACKGROUND

The bankrupcty court conducted a trial on December 3, 2010, and found the following

facts.  *See Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 454 B.R. 374, 379 (Bankr.

W.D. Tex. 2011).  Allen C. Borschow ("Allen") and Patricia L. Borschow ("Patricia")

1

(collectively "Debtors") owned a business called Borschow Industries ("BI"). *Id.* at 381. BI, in

turn, owned a company called Almost Originals that specialized in transferring prints of artwork

onto canvas. *Id.* In 2004, the business began to decline, and Debtors needed an injection of cash.

*Id.* BI obtained a Small Business Administration Loan through State National Bank ("SNB") for

$90,000 (the "SNB Loan"). The SNB Loan was secured by all of BI's inventory, accounts

receivable, and equipment. *Id.* Additionally, BI secured a $75,000 line of credit by executing a

promissory note with SNB that was also secured by all of BI's inventory, accounts receivable,

and equipment. *See id.*; Debtors' Resp. 14, ECF No. 10; Turbo's Reply 4, ECF No. 12.

In 2005, Allen became friends with Ernest Koury ("Ernest") and Omar Koury ("Omar")

(collectively "Kourys"). *In re Borschow*, 454 B.R. at 381. The three met at the El Paso Country

Club and played poker together. *Id.* In March of 2006, Allen, through Almost Originals, began

working with Eureka Media Group ("Eureka") to create a catalogue of prints and update BI's

website. *Id.* Ernest owns and operates Eureka, a high tech marketing and promotions business.

*Id.*

Despite hopes that Eureka would reinvigorate BI's business, BI continued to lose money.

*See id.* Debtors became increasingly dissatisfied with Eureka's work, complaining that Eureka

failed to complete the catalogue in a timely manner and failed to sufficiently populate the website

with images of its products. *See id.* Debtors were also not paying Eureka, and thus BI started to

owe Eureka thousands of dollars. *See id.* at 381-82. To make matters worse, BI's business

account was overdrawn and incurring fees. *See id.* at 385, 390-91.

In September of 2006, Allen announced at the weekly poker game that he could no longer

afford his membership at the El Paso Country Club. *Id.* at 381. According to Allen, the Kourys

then asked if they could help.  *Id.*

Allen and the Kourys met a few days later at Jaxon's Restaurant and Brewing Company. *Id.*  Exactly what the parties discussed at that meeting is not clear.  *Id.*  However, two things are certain.  First, the parties agreed that Allen would talk to the Kourys' banker at JPMorgan Chase Bank ("Chase Bank") about obtaining a loan.  *Id.* at 382.  Second, Omar started loaning Allen money after their meeting at Jaxson's.  *Id.*

On September 30, 2006, Omar wrote the first check payable to Allen for $10,000.  *Id.*  On November 3, 2006, Turbo Aleae Investments Inc. ("Turbo") acting through Omar, wrote another check payable to Allen, this time for $80,000.  *Id.*  Omar and Allen were directors of Turbo.  *Id.* at 381.  That same day, Allen signed a promissory note in favor of Turbo for $90,000.  *Id.* at 382.

On December 1, 2006, Omar wrote a third check payable to Allen in the amount of $10,000, and wrote in the memo section "personal loan."  *Id.*  On December 8, 2006, Omar wrote a fourth check payable to Allen for $27,608.46, again labeled as a "personal loan."  *Id.*; Debtors' Br. 3.  On January 18, 2007, Omar wrote a final check payable to Allen — this time in the amount of $21,391.54 (the "Final Check").  *In re Borschow*, 454 B.R. at 382, 401.  Omar labeled the Final Check as a "personal loan."  *Id.* at 382.

At some point during this time period, Chase Bank declined to grant Allen, BI or Debtors a loan.  *Id.*  Instead, on January 25, 2007, Turbo obtained a loan from Chase Bank for $150,000 with an interest rate of 7.25%.  *Id.*

On January 29, 2007, Allen signed a second promissory note in favor of Turbo in the amount of $150,000 with an interest rate of 10.25% (the "January 29th Note").  *Id.*  Although the total amount from the checks only added up to $149,000, Omar testified that the extra $1,000, the

difference between the $149,000 lent by the checks and the $150,000 January 29th Note,
reflected accrued interest. *Id.* at 382 n.3.

On September 18, 2007, both Allen and Patricia executed a letter agreement in favor of
Turbo in the amount of $174,500.41 (the "Letter Agreement"). *Id.* at 383. This was the first
time that Patricia was involved with the loans. *See id.* at 383, 403. The Letter Agreement
consolidated all the debt owed by Debtors and BI to Turbo — specifically the $153,775 balance
from the January 29th Note and the remaining amount BI owed to Eureka for its work on BI's
catalogue and website. *See id.* at 383. As part of the agreement, Debtors immediately paid
$7,000 to Turbo. *Id.* On September 28, 2007, Debtors executed a new promissory note in favor
of Turbo for approximately $167,500 with an interest rate of 10.25% (the "Final Turbo Note").
*Id.* Debtors agreed to pay monthly payments to Turbo of $1,700. *Id.*

Debtors made the first six payments on the Final Turbo Note, for a total of $10,200, but
then stopped paying in March of 2008. *See id.* On January 26, 2009, Debtors filed for
bankruptcy under Chapter 7. *Id.* Turbo then filed an adversary proceeding in Debtors'
bankruptcy case seeking a determination that Debtors fraudulently secured the loans from Turbo,
and thus the loans are non-dischargeable under 11 U.S.C. § 523(a)(2)(A). *Id.* at 379. Section
523(a)(2)(A) states that "money, property, services, or an extension, renewal, or refinancing of
credit, to the extent obtained by false pretenses, a false representation, or actual fraud" is non-
dischargeable in bankruptcy. 11 U.S.C. § 523(a)(2)(A).

To support their claim under § 523(a)(2)(A), the Kourys testified that Allen promised
during the loan process that he would use the loans (1) to pay off the SNB Loan, which would
release SNB's lien on BI's equipment, (2) to cover the overdrafts and bank charges in BI's

4

business bank accounts, (3) to obtain life insurance listing Turbo as a beneficiary, and (4) to pay

off the amount owed to Eureka.[1]  *In re Borschow*, 454 B.R. at 388-93.

In regard to the first three promises — to pay off the SNB Loan, to cover the overdrafts,

and to obtain life insurance — the bankruptcy court found the Kourys' testimony lacked

credibility.  *See id.* at 398-400, 402.  The bankruptcy court found that these issues were likely

discussed, but were not promises or conditions to the loan.  *See id.* at 398-402.  Critically, there

was no written evidence from the relevant time period to support the Kourys' account.  *See id.*

None of the notes or agreements mentioned any of these alleged promises.  *See id.*  Rather, the

bankruptcy court found that the contemporaneous written evidence — the checks themselves —

suggested there were no conditions because several of the checks were labeled personal loans and

were payable to Allen personally.  *See id.*  Additionally, the bankruptcy court found that the

undisputed evidence showed that the Kourys had expected to be paid back once Allen secured a

loan from the Kourys' banker at Chase.  *See id.* at 397-98.  Thus, it seemed unlikely that the

Kourys were counting on Allen's promises about how he would use the loan.  *See id.*  Finally, the

Kourys testified that BI's paying off the SNB Loan was important to them because that would

allow the Kourys to secure their loan with BI's equipment.  *See id.* at 389, 398.  But, according to

the bankruptcy court, the Kourys' testimony was not credible because the undisputed evidence

showed that the Kourys never examined the equipment, never ascertained the equipment's value,

and never secured a lien on the equipment.  *See id.*  Therefore, the bankruptcy court held that

---

[1]     Turbo also alleged that Allen promised a lien on Debtors' homestead.  *Id.* at 393.
The bankruptcy court determined that there was insufficient evidence of reliance
or damage.  *Id.* at 402.  Thus, the bankruptcy court held that "Allen did not
commit actual fraud under § 523(a)(2)(A) by falsely representing that he would
grant Turbo a lien on his homestead."  *Id.*  Neither party contests this
determination on appeal.

Turbo could not establish a claim under § 523(a)(2)(A) for the alleged promises to (1) to pay off the SNB Loan, which would release SNB's lien on BIs equipment, (2) to cover the overdrafts and bank charges in their business bank accounts, and thereby improve his cash flow, or (3) to obtain life insurance listing Turbo as a beneficiary. *See id.* at 404.

The bankruptcy court did rule in favor of Turbo on one issue. The bankruptcy court found that Allen had promised to use the Final Check in the amount of $21,391.54 to immediately pay off the $21,391.54 then owed to Eureka (the "Eureka Debt"). *Id.* at 401. The evidence showed that Allen had asked Omar for $50,000 in December of 2006. *Id.* at 392. Omar testified that he only gave $27,608.46, and initially withheld $21,391.54 because Debtors owed Eureka that amount.[2] *Id.* Allen stated that he wanted the money paid directly to him for accounting purposes, and promised to immediately pay the Eureka Debt with a credit card or directly if Omar gave him the money. *See id.* at 392, 401. Omar then wrote the Final Check for $21,391.54. *Id.* Despite Allen's promise to "immediately write a check or use a credit card to pay Eureka directly," the bankruptcy court found that Allen only paid $4,000, and never paid the remainder. *Id.*

The bankruptcy court found Omar's testimony credible because Omar "intended to hold back the money to pay Eureka directly and it is unlikely he would be willing [to] part with the money without the representation that Allen would pay Eureka with the money." *Id.* at 401. Moreover, Allen admitted at trial that he apologized to the Kourys for not paying the Eureka Debt. *Id.*

---

[2] The Court notes that these two amounts do not add up to $50,000, but to $49,000. This factual discrepancy, however, does not change the analysis.

Accordingly, the bankruptcy court held that the Eureka Debt was non-dischargeable under § 523(a)(2)(A) because (1) Allen represented he would pay the Eureka Debt; (2) at the time he made the representation he knew he would not pay the Eureka Debt; (3) he made the statements intending to deceive Omar so he would give him the money; (4) Omar justifiably relied on Allen's representation; and (5) Omar was damaged because Allen did not use the money to pay off his Eureka Debt. *Id.* After crediting Debtors for their $4,000 payment to Eureka on February 27, 2007, the bankruptcy court determined that $17,391.54 plus $7,576.19 in pre-judgment interest was non-dischargeable due to actual fraud by Allen.[3] *See id.* at 401, 404.

In summary, the bankruptcy court determined that all but the Eureka Debt was dischargeable. *See id.* at 404. The bankruptcy court aptly explained that this "case illustrates what can happen when a friend loans money to another friend, and then the relationship turns sour when the friend cannot repay the loan." *Id.* at 379. Both sides now appeal.

## II. JURISDICTION

District courts have jurisdiction to hear "appeals from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings" under the bankruptcy laws in Title 11 of the United States Code. 28 U.S.C. § 158(a). Such proceedings include so-called "core proceedings," such as "proceedings to determine, avoid, or recover fraudulent conveyances." 28 U.S.C. § 157(b)(2)(H). Unlike in non-bankruptcy cases, a final order for the purposes of § 158 appellate jurisdiction need not dispose of the entire case. *Smith v. Revie (In re*

---

[3]     The bankruptcy court found that only Allen, and not Patricia made the representation about paying off the Eureka Debt. *See id.* at 43. Thus, the bankruptcy court held that Patricia's debt was dischargeable. *Id.* Patricia only joins the appeal "because of the future impact the judgment for $29,967.23 may have upon her community property." Debtors' Br. 2 n.*.

*Moody*), 817 F.2d 365, 367-68 (5th Cir. 1987).  The Fifth Circuit explained that "for the purpose of Yogi Berra's celebrated maxim, 'The game isn't over till it's over,' a bankruptcy proceeding is over when an order has been entered that ends a discrete judicial unit in the larger case."  *Id.*

Here, the order of the bankruptcy court entered final judgment on a core proceeding between Debtors and Turbo.  *See In re Borschow*, 454 B.R. at 379, 404.  Specifically, the bankruptcy court held that the debt owed by Debtors to Turbo was dischargeable, with the exception of $17,391.54 plus $7,576.19 in pre-judgment interest which was non-dischargeable due to actual fraud by Allen.  *Id.*  Accordingly, the bankruptcy court's ruling ended a discrete judicial unit, and this Court has jurisdiction to hear the appeal.  *See In re Moody*, 817 F.2d at 367-68.

## III.    STANDARD OF REVIEW

"When reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court and applies the standard of review generally applied in federal court appeals."  *Webb v. Reserve Life Ins. Co.* (*In re Webb*), 954 F.2d 1102, 1103-04 (5th Cir. 1992) (citing *Griffith v. Oles* (*In re Hipp, Inc.*), 895 F.2d 1503, 1517 (5th Cir. 1990)).  Federal Rule of Bankruptcy Procedure 8013 specifically provides that district courts shall not set aside a bankruptcy court's findings of fact unless clearly erroneous.  Fed. R. Bankr. P. 8013.  "As long as there are two permissible views of the evidence," a bankruptcy court's "choice between competing views" is not clearly erroneous.  *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 373 (5th Cir. 2005).  The bankruptcy court's account need only be "plausible in light of the record viewed as a whole."  *Id.*

In contrast to the standard of review for factual determinations, a district court reviews

the bankruptcy court's conclusions of law de novo. *Century Indem. Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir. 2000). Likewise, a district court reviews mixed questions of fact and law de novo. *Id.*

## IV.    DISCUSSION

Debtors and Turbo filed competing appeals. In their appeal, Debtors argue that the bankruptcy court erred in determining that the Eureka Debt was non-dischargeable. Debtors' Br. 1. Turbo responds that bankruptcy court was correct that the Eureka Debt was non-dischargeable. Turbo's Resp. 5, ECF No. 9.

In its appeal, Turbo argues that the bankruptcy court erred when it determined the rest of the debt, which the Debtors owed to Turbo, was dischargeable. Turbo's Br. 1. Not surprisingly, Debtors argue that the bankruptcy court correctly determined that the rest of the debt was dischargeable. Debtors' Resp. 27. The Court first examines Debtors' appeal and then Turbo's appeal.

### A.    Debtors' Appeal — The Eureka Debt

Debtors argue that bankruptcy court erred in determining that the Eureka Debt was non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Debtor's Br. 1. Section 523(a)(2)(A) states that "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud" is non-dischargeable. 11 U.S.C. § 523(a)(2)(A). "The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

9

For a debt to be non-dischargeable under the actual fraud provision of § 523(a)(2)(A), the creditor must show by a preponderance of the evidence that (1) the debtor made a representation; (2) that the debtor knew the representation was false; (3) the representation was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result of its reliance. *In re Acosta*, 406 F.3d at 372 (citing *AT&T Universal Card Servs. v. Mercer* (*In re Mercer*), 246 F.3d 391, 403 (5th Cir. 2001).

Debtors argue that bankruptcy court erred in determining that the Eureka Debt was non-dischargeable based on two of the elements.  First, Debtors argue that Turbo failed to establish detrimental reliance.  Debtors' Br. 13.  Second, Debtors argue that Turbo failed to establish that Allen made a false representation.  Debtors' Br. 16.  Finally, Debtors argue that even if the Eureka Debt was non-dischargeable, the bankruptcy court failed to credit the $17,200 that Debtors paid towards the Eureka Debt.  Debtors' Br. 20.  The Court examines each argument in turn.

### 1.    Detrimental reliance

According to Debtors, the bankruptcy court erred in determining that the Eureka Debt was non-dischargeable under § 523(a)(2)(A) because the lender was not Turbo, but Omar.  Debtors' Br. 13.  Therefore, according to Debtors, Turbo could not establish the necessary element of reliance.  *Id.*

As stated above, Omar wrote Allen a check for $27,608 in response to Allen's request for a $50,000 loan.  *See In re Borschow*, 454 B.R. at 382.  The bankruptcy court found that the reason Omar only gave $27,608 and not $50,000 was because Omar had subtracted the amount

10

owed to Eureka.  *Id.* at 401.  Allen then asked Omar to give him the remaining $21,391 so that

"he could pay Eureka directly for accounting purposes."  *Id.*  Despite Allen's promise to

"immediately write a check or use a credit card to pay Eureka directly," the bankruptcy court

found that Allen only paid $4,000, and never paid the remainder.  *Id.* at 392, 401.

The bankruptcy court held, and Debtors do not appear to contest that Omar later assigned

the Eureka Debt to Turbo.[4]  *See id.* at 382 ("It was not disputed that the loans made by Omar

personally were assigned to Turbo"); Debtors' Br. 13.  Rather, Debtors' argument is that because

Omar lent the money, not Turbo, any "misrepresentation" by Debtors to Omar could not result in

Turbo relying on the misrepresentation.  Debtors' Br. 11-15.  Turbo responds that it can step into

the shoes of Omar as an assignee.  Turbo's Resp. 5-7.

This dispute presents a narrow issue: whether the assignee of a debt must itself have

relied on the false statement or whether it is enough that the original creditor relied on the false

statement to prevent a debtor from discharging the debt in bankruptcy.

Although the Fifth Circuit has not considered this issue, the Ninth Circuit in *Boyajian v.*

*New Falls Corp. (In re Boyajian)* examined a similar anti fraud provision — § 523(a)(2)(B) —

and held it was enough that the original creditor relied on the false statement to prevent a debtor

---

[4]       If Debtors are trying to contest the validity of the assignment from Omar to
Turbo, that issue cannot be raised on appeal because it was not presented to the
bankruptcy court.  "It is a bedrock principle of appellate review that claims
raised for the first time on appeal will not be considered" absent exceptional
circumstances.  *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650
F.3d 593, 600 (5th Cir. 2011) (quoting *Cadle Co. v. Duncan (In re Duncan)*,
562 F.3d 688, 697 (5th Cir. 2009)).  In the bankruptcy court, Debtors did argue
that Turbo cannot establish reliance because only Omar, and not Turbo, heard
the alleged promise and made the loan.  *In re Borschow*, 454 B.R. at 380.
However, Debtors did not dispute at trial "that the loans made by Omar
personally were assigned to Turbo."  *Id.* at 382.  Therefore, Debtors can raise the
issue of reliance, but cannot challenge whether the loans were in fact assigned to
Turbo.

from discharging the debt in bankruptcy.  564 F.3d 1088, 1091-93 (9th Cir. 2009).  The provision at issue in this case, § 523(a)(2)(A), generally covers fraud, but does not cover statements about a person's financial condition.  *See id.*; *Field v. Mans*, 516 U.S. 59, 66 (1995).  The statue at issue in *In re Boyajian*, § 523(a)(2)(B) fills that gap and makes a "transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied" non-dischargeable.  *Field*, 516 U.S. at 66; *see also* 11 U.S.C. § 523(a)(2)(B).

The Ninth Circuit held that an assignee could seek a claim for non-discharge under § 523(a)(2)(B) because the statutory language and policy considerations supported that construction.  *See In re Boyajian*, 564 F.3d at 1091-93.  Moreover, the Ninth Circuit noted that the Seventh Circuit similarly held that an assignee could seek a claim under both § 523(a)(2)(B) and § 523(a)(2)(A).  *See In re Boyajian*, 564 F.3d at 1092 (citing *FDIC v. Meyer (In re Meyer)*, 120 F.3d 66, 70-71 (7th Cir. 1997)).  The Seventh Circuit explained that "the very reason that the institution of assignment exists is to enable Creditor to transfer its rights against Debtor . . . to Assignee."[5]  *In re Meyer*, 120 F.3d at 70.

---

[5]     Several lower courts have similarly concluded that it is enough that the original creditor relied on the false statement.  *See First Am. Title Ins. Co. v. Pazdzierz (In re Pazdzierz)*, 459 B.R. 254, 261-62 (E.D. Mich. 2011) (holding that an assignee could seek recourse under § 523(a)(2)(B)); *Bertuca v. Flores (In re Flores)*, Bankruptcy No. 09-10109, 2010 WL 3811920, at *3 (Bankr. S.D. Tex. Sept. 22, 2010) ("The assignment of a debt does not alter its nondischargeability under 11 U.S.C. § 523(a)(2)(A)"); *FDIC v. Bombard (In re Bombard)*, 59 B.R. 952, 955 (Bankr. D. Mass. 1986) (assuming an assignee could bring a non-dischargeability claim, and finding that the debtor's debt to the FDIC, an assignee of the original creditor, was non-dischargeable under § 523(a)(2)(A)).  *But see WDH Howell, LLC v. Hurley (In re Hurley)*, 285 B.R. 871, 875-76 (Bankr. D.N.J. 2002) (stating an assignee must also show reliance, but providing no analysis of the issue); *Tompkins & McMaster v. Whitenack (In re Whitenack)*, 235 B.R. 819, 825-27 (Bankr. D.S.C. 1998) (citing *Gen. Elec. Capital Corp. v. Bui (In re Bui)*, 188 B.R. 274, 278-79 (Bankr. N.D. Cal. 1995), *overruled by*

The Court agrees with the Ninth and Seventh Circuits and holds that an assignee of a debt can step into the shoes of the original creditor for purpose of § 523(a)(2)(A) — i.e. it is enough that the original creditor relied on the false statement.  As explained below, this interpretation best accords with the text of the statute, policy considerations, and general principles of bankruptcy law.

The text of § 523(a)(2)(A) states that "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud" is non-dischargeable.  11 U.S.C. § 523(a)(2)(A).  The words "obtained by . . . fraud" suggest that the relevant time period is the inception of the debt.  *See McClellan v. Cantrell*, 217 F.3d 890, 896 (7th Cir. 2000) (Ripple, J., concurring) ("The language 'obtained by' clearly indicates that the fraudulent conduct occurred at the inception of the debt, i.e., the debtor committed a fraudulent act to induce the creditor to part with his money or property.").  Thus, the language of the statute suggests that the loan became fraudulent at the point when Allen misrepresented he would immediately pay back the amount owed to Eureka, and Omar then relied on that misrepresentation and lent the money.  And the language of the statute does not suggest that loan's characterization as fraudulent somehow changes if the original creditor later assigns the loan.

Policy considerations also suggest that § 523(a)(2)(A) allows an assignee to step into the shoes of the original creditor.  Under Debtors' interpretation of  § 523(a)(2)(A), a person can fraudulently obtain the loan, but then still have the debt discharged, if the original creditor

---

*Boyajian*, 564 F.3d at 1092).

13

transfers the loan.  There is no good policy reason to reward a person for defrauding another simply because the defrauded party later chose to assign the loan.  *See In re Boyajian*, 564 F.3d at 1092 (noting "the perversity of permitting dishonest debtors to receive a discharge through the fortuity that their creditor chose to assign the debt").  Reading § 523(a)(2)(A) to ensure a debtor who defrauds another is not rewarded also comports with the basic principle of bankruptcy law to afford relief only "to an 'honest but unfortunate debtor.'"  *Cohen*, 523 U.S. at 217 (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).  Thus, § 523(a)(2)(A) should discourage fraud regardless of whether the creditor later assigns the loan.

Additionally, Debtors' interpretation of § 523(a)(2)(A) could disrupt the functioning of the modern debt markets.  *See In re Boyajian*, 564 F.3d at 1092.  It is a common feature of modern debt markets for original creditors to assign loans to companies who then bundle the loans together and resell them to spread the risk of default.  *See* Frank Partnoy and David A. Skeel, Jr., *The Promise and Perils of Credit Derivatives*, 75 U. Cinn. L. Rev. 1019, 1019-21, 1023, 1036 (2007).  The purchasers of the loans rely on the original creditor to assess the risk of default.  The original creditor, in turn, relies on the borrower to provide accurate information.  If the borrower defrauded the original creditor, the bankruptcy code recognizes that the creditor should not have to suffer discharge — after all, the creditor assessed the risk based on false information.  If that first assignment were to negate a means to challenge dischargeability, as Debtors argue, later purchasers of the loan would lose this valuable protection from bankruptcy discharges.  This in turn would diminish the value of loans on the secondary market or force parties to spend resources investigating the original loan transaction for potential fraud.

In response, Debtors argue that 11 U.S.C. § 523(a)(14), (14A), and (14B) provide the

only three situations in which an assignee can step into the shoes of an earlier creditor.  Debtors'

Reply 4, ECF No. 11.  This argument wholly lacks support.

Those provisions state that a debt shall not be dischargeable if:

(14) incurred to pay a tax to the United States that would be nondischargeable
pursuant to paragraph (1);

(14A) incurred to pay a tax to a governmental unit, other than the United States,
that would be nondischargeable under paragraph (1);

(14B) incurred to pay fines or penalties imposed under Federal election law.

11 U.S.C. § 523(a)(14), (14A), (14B).

These are simply additional reasons a debt may not be dischargeable.  Just as 11 U.S.C. §

523(a)(2)(A) prevents the discharge of fraudulently obtained loans, § 523(a)(14B) makes fines or

penalties imposed under federal election law non-dischargeable.  11 U.S.C. § 523(14B).  There is

no suggestion in the statue, and Debtors cite no authority to suggest that these provisions govern

whether an assignee can utilize § 523(a)(2) to prevent the discharge of a fraudulently obtained

loan.

In conclusion, the Court holds that Turbo, as the assignee of the Eureka Debt, stepped

into the shoes of Omar for the purposes of § 523(a)(2)(A).  Therefore, the bankruptcy court did

not err in ruling that Turbo, as an assignee, could seek recovery under § 523(a)(2)(A).

## 2.      False representation

According to Debtors, the bankruptcy court erred in determining that the Eureka Debt

was non-dischargeable under § 523(a)(2)(A) because Turbo failed to establish the necessary

element of false representation.  Debtors' Br. 15-16.  Debtors specifically argue that the

bankruptcy court erred in finding that Allen never intended to pay back the Eureka Debt.  *Id.*

15

Debtors suggest that Allen "had all along informed Omar that [BI] was losing money, and each new advance was in response to Allen's reports of [BI]'s ongoing poor sales and need for capital." *Id.* 16. Turbo responds that the trial record supports the bankruptcy court's factual determination that Allen never intended to pay back the Eureka Debt. Turbo's Resp. 7.

Debtors have a significant burden to overcome. A district court will only set aside a bankruptcy court's findings of fact if "clearly erroneous." Fed. R. Bankr. P. 8013. "As long as there are two permissible views of the evidence," the bankruptcy court's "choice between competing views" is not clearly erroneous. *In re Acosta*, 406 F.3d at 373. The bankruptcy court's account need only be "plausible in light of the record viewed as a whole." *Id.*

Here, the bankruptcy court's findings were amply supported by the record. The bankruptcy court heard testimony from Allen, Omar, and Ernest regarding the Eureka Debt. According to the testimony, Allen claimed that he would only pay off the Eureka Debt if he could. *In re Borschow*, 454 B.R. at 392, 401. Omar and Ernest testified that Allen promised to pay off the Eureka Debt with the additional money. *Id.* The bankruptcy court found that the testimony of Omar and Ernest was "very credible" while Allen's testimony was "conflicting." *Id.* The court reasoned that the fact that Omar originally held back the amount owed to Eureka makes it "unlikely he would be willing [to] part with the money without the representation that Allen would pay Eureka with the money." *Id.* Moreover, Allen admitted at trial that he apologized for not paying the Eureka Debt. *Id.* In sum, the bankruptcy court's finding that Allen never intended to pay off the Eureka Debt was not clearly in error.

The Court notes that it is odd that Allen paid $4,000 of the Eureka Debt, and yet the bankruptcy court still found that Allen had never intended to pay the Eureka Debt. However, the

relevant time period for determining Allen's intentions was the time of the promise — i.e. at the time Allen promised to pay the Eureka Debt immediately, did he actually intend to follow through with his promise?  What happened after the promise is relevant, but not conclusive. Allen could have never intended to pay back the loan at the time of the promise, and yet later decided to pay back a portion of it.  And the bankruptcy court was in the best position to make this determination by considering the competing testimony and evidence.  *See Smith v. FDIC (In re Smith)*, 39 F.3d. 320, at *2 (5th Cir. 1994) ("The bankruptcy court was in the best position to weigh the evidence and judge the credibility of the witnesses.").

Debtors point to *In re Sheridan*, 57 F.3d 627 (7th Cir. 1995) to support their argument. Debtors' Br. 17.  In *In re Sheridan*, a bank loaned money to a debtor upon his promise that he would use the funds for deposits on real-estate transactions.  57 F.3d at 630-31, 635-36.  The evidence showed that the debtor first put the money in an overdrawn bank account, and then later used other money for the deposits on two real-estate transactions.  *See id.*  The creditor thus argued that the debtor had failed to honor his promise, and that the debtor never intended to honor his promise.  *See id.*  Despite the debtor technically using different funds, the bankruptcy court found that the debtor had followed through with his promise to use the money for deposits on real-estate because money is generally fungible.  *Id.* at 632, 636.  The Seventh Circuit then affirmed this finding.  *Id.*

Debtors argue that the bankruptcy court's finding in the instant case was in error because just like in *In re Sheridan*, Allen was not lying to Omar.  Debtors' Br. 17-18.  Debtors argue that Allen simply could not immediately pay off the Eureka Debt because the bank overdraft charges consumed most of the funds.  *Id.*  But this argument is flawed in two respects.  First, there is a

17

significant factual difference between this case and *In re Sheridan* — namely, in *In re Sheridan* the debtor did what he said he would do.  The debtor placed deposits on two real estate transactions.  *In re Sheridan*, 57 F.3d at 630-31, 635-36.  The court found that the debtor's later performance of his promise was strong evidence that the debtor intended, at the time of the promise, to honor his promise.  *See id.*  In contrast, Allen said he would pay back the Eureka loan, but then only paid back a small portion of it.  *In re Borschow*, 454 B.R. at 392, 401.  In other words, Allen did not do as he promised.  *Id.*  Therefore, Allen's partial performance is of much more limited evidentiary value in determining Allen's intent to honor his promise.

Second, the Seventh Circuit did not create a rule of law in *In re Sheridan* that performance of a promise necessarily means that the party originally intended to honor the promise.  Rather, the Seventh Circuit affirmed the factual finding of a bankruptcy court and explained why the factual finding made sense.  *See In re Sheridan*, 57 F.3d at 630-31, 635-36.  In this case, Debtors have the burden of showing that the bankruptcy court's finding of fact was clearly erroneous.  *See In re Acosta*, 406 F.3d at 373.  Just because another court came to a different factual conclusion regarding similar circumstances does not make the bankruptcy court's conclusion in this case necessarily erroneous.  *See Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (explaining that two courts could come to different factual conclusions based on the exact same facts and neither would be clearly erroneous).  After all, the two cases have different facts and different witnesses.  That the bankruptcy court in *In re Sheridan* ruled differently does not mean that the witnesses in this case were any more or less credible.

In conclusion, the bankruptcy court's factual finding that Allen never intended to pay back the Eureka Debt is not clearly erroneous.  Accordingly, the Court affirms the bankruptcy

18

court's determination that the Eureka Debt was non-dischargeable under § 523(a)(2)(A).

### 3.     Credit for payment on the Eureka Debt

Debtors argue that bankruptcy court erred in determining how much of the Eureka Debt was non-dischargeable under § 523(a)(2)(A). Debtors' Br. 20. The bankruptcy court found that Allen made a $4,000 payment on the Eureka Debt, and thus the remaining $17,391.54 was non-dischargeable. *In re Borschow*, 454 B.R. at 392-93, 401. Debtors argue that the bankruptcy court failed to also credit their later payments totaling $17,200. Debtors' Br. 20. Turbo responds that the $17,200 paid by Debtors was towards the Final Turbo Note, not the Eureka Debt. Turbo's Resp. 10.

As stated above, this Court will only set aside a bankruptcy court's findings of fact if "clearly erroneous." Fed. R. Bankr. P. 8013. Here, the record supports the bankruptcy court's findings. The evidence showed that Allen made a $4,000 payment on February 27, 2007, to Eureka. *In re Borschow*, 454 B.R. at 392-93, 401. The evidence also showed that Allen made several payments to Turbo after the parties consolidated all of the debt into the Final Turbo Note in September of 2007. *Id.* at 383. Those payments were $7,000 in September of 2007, and then six payments of $1,700 in 2008, for a total of $17,200. *Id.* Thus, the timing of the payments supports the bankruptcy's determination that the $4,000 payment in February should be credited towards the Eureka Debt, but not the later payments on the Final Turbo Note. And critically, Debtors provide no explanation why those later payments should be credited towards the Eureka Debt. *See* Debtors' Br. 20-21. Simply concluding that the "bankruptcy judge clearly erred" without giving any explanation or competing evidence does not make it so.

19

### 4.      Conclusion

In conclusion, the bankruptcy court's determination that the Eureka Debt was procured by

actual fraud is affirmed.  The Eureka Debt was non-dischargeable under § 523(a)(2)(A) in the

amount of $17,391.54 plus $7,576.19 in pre-judgment interest.

### B.      Turbo's Appeal

In its appeal, Turbo argues that the bankruptcy court erred, and the bankruptcy court

should have held that entire $150,000 loaned to Debtors was non-dischargeable under §

523(a)(2)(A).  Turbo's Br. 6.  Turbo specifically argues that Allen fraudulently represented he

would use the loan proceeds to pay off the SNB Loan and cover bank overdrafts.  *Id.*  In the

alternative, Turbo argues the entire debt should be non-dischargeable under a false pretense or

false representation theory.  *Id.* 10-12.  Debtors argue that Bankruptcy Court did not err.

Debtors' Resp. 18.  The Court examines each of Turbo's arguments in turn.

### 1.      Actual Fraud

As stated above, for a debt to be non-dischargeable under the actual fraud provision of §

523(a)(2)(A), the creditor must show by a preponderance of the evidence that (1) the debtor made

a representation; (2) that the debtor knew the representation was false; (3) that the representation

was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably

relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its

reliance.  *In re Acosta*, 406 F.3d at 372 (citing *In re Mercer*, 246 F.3d at 403).

The bankruptcy court organized its opinion based on each of the alleged purposes of the

loan.  *See In re Borschow*, 454 B.R. at 380, 397-402.  The Court follows the same structure, but

only examines the promise to pay off the SNB Loan and cover the overdrafts because those are

the focus of Turbo's appeal.

### a.   SNB Loan

The bankruptcy court held that Turbo failed to establish three of the necessary elements for its § 523(a)(2)(A) claim based on Allen's alleged promise to pay off the SNB Loan. *Id.* at 397-99.  First, the bankruptcy court found that Allen did not make a representation that he would pay off the SNB Loan. *Id.* at 398-99.  Second, the bankruptcy court found that Turbo did not rely on this alleged representation. *Id.* at 397-98.  And third, the bankruptcy court found that Turbo failed to prove damages. *Id.* at 399.  In its appeal, Turbo argues these findings were clearly erroneous because the evidence established all of the elements.  Turbo's Br. 6.

Given that Turbo challenges the factual findings of the bankruptcy court, it has a significant burden to overcome.  As stated above, a district court will only set aside a bankruptcy court's findings of fact if "clearly erroneous."  Fed. R. Bankr. P. 8013.  "As long as there are two permissible views of the evidence," the bankruptcy court's "choice between competing views" is not clearly erroneous. *In re Acosta*, 406 F.3d at 373.  The bankruptcy court's account need only be "plausible in light of the record viewed as a whole." *Id.*

In this case, the record amply supports the the bankruptcy court's finding that there was no misrepresentation.  The bankruptcy court explained the conflicting evidence as follows:

> Here, the Court is faced with two versions of the events surrounding the loans from Turbo to Allen.  On the one hand, we have a creditor swearing that the debtor promised to use the loan proceeds to pay off the SNB Loan.  On the other hand, we have a debtor swearing that he made no such representation.

*In re Borschow*, 454 B.R. at 397.

The bankruptcy court then found Allen's testimony more credible because there was no written evidence that Allen promised to pay off the SNB Loan. *Id.* at 397-98.  The bankruptcy

21

court reasoned that although written evidence is not required, "it is hard to imagine that if the purposes of the $150,000 loan were so important to the Kourys that they relied on them in making the loan, that these experienced and sophisticated businessmen would not document those purposes in writing in some manner." *Id.* at 398.  Moreover, the bankruptcy court noted that Omar wrote the checks directly to Allen, and wrote "personal loan" in the memo section of several of the checks.  *Id.*  The court reasoned that if the loan was meant to pay off the SNB Loan, one would think Omar would have written the check to SNB or at least to BI given that the loan was in BI's name.  *See id.*

The bankruptcy court also found that even if Allen had promised to pay off the SNB Loan, Turbo failed to show it relied on the alleged misrepresentation.  *See id.* 397-98.  "For a debt to be non-dischargeable under section 523(a)(2)(A), the creditor must show . . . that the creditor actually and justifiably relied on the representation."  *In re Acosta*, 406 F.3d at 372 (citing *In re Mercer*, 246 F.3d at 404).  Justifiable reliance is an intermediate level of reliance between reasonable reliance and mere reliance in fact.  *Field*, 516 U.S. at 73-75.  "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."  *Id.* at 71 (quoting Restatement (Second) of Torts § 545A, Comment *b*. (1976)).  The person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation."  *Id.* (quoting Restatement (Second) of Torts § 541, Comment *a*).

The bankruptcy court's determination that Turbo failed to show reliance was not in error. The undisputed evidence showed that the Kourys originally believed that Allen would pay back their loan upon obtaining a loan from Chase Bank.  *See In re Borschow*, 454 B.R. at 397-98.  The

bankruptcy court logically reasoned that "there is no reason Turbo would rely on any statements Allen might have made about how he would use the loan proceeds to pay SNB at the time the loans were made because at that time Turbo expected to be paid from the Chase Bank loan proceeds." *Id.*

Turbo suggests the Kourys did rely because paying off the SNB Loan would "thereby free[] up the corporate assets for use as security." Turbo's Br. 7-8. But this argument holds no weight when the uncontradicted evidence showed the Kourys never attempted to secure a lien on the corporate assets. *In re Borschow*, 454 B.R. at 398. And this alleged reliance is even more dubious given that the undisputed evidence showed that the Kourys neither examined the assets nor knew their value. *See id.*

The heart of Turbo's argument on appeal is that the bankruptcy court should have believed the testimony of Omar and Ernest. *See* Turbo's Br. 7. That is just not enough to show clear error when "[t]he bankruptcy court was in the best position to weigh the evidence and judge the credibility of the witnesses. *See In re Smith*, 39 F.3d. 320, at *2.

In conclusion, the bankruptcy court did not err in determining that Turbo failed to establish a misrepresentation or reliance. Further, because both of these are necessary elements to establish a claim under § 523(a)(2)(A), the Court need not examine the other elements. The bankruptcy court's holding that Turbo could not establish a claim under § 523(a)(2)(A) is affirmed.

### b.    Overdrafts

The bankruptcy court found that Turbo failed to establish that Allen made a representation that he would use the loan to cover overdrafts, failed to establish that Allen

intended to deceive Omar, and failed to establish that Turbo justifiably relied on Allen's alleged promise. *See In re Borschow*, 454 B.R. at 399. Any one of these failings would defeat Turbo's claim under § 523(a)(2)(A). In its appeal, Turbo argues these findings were clearly erroneous because the evidence established all of the elements. Turbo's Br. 7.

Once again, Turbo's argument is essentially that the bankruptcy court should have believed Turbo's witnesses. *See id.* As stated above, that is not enough when "[t]he bankruptcy court was in the best position to weigh the evidence and judge the credibility of the witnesses." *See In re Smith*, 39 F.3d. 320, at *2.

The record amply supports the bankruptcy court's finding that Turbo failed to show that Allen represented that he would use the loan to cover overdrafts. As much as Turbo may think its witnesses were more credible, the bankruptcy judge disagreed. *In re Borschow*, 454 B.R. at 400. Beyond the testimonial evidence, there was no written evidence that the loan was given on the condition that Allen cover his bank overdrafts. *See id.* at 389-92, 400. Instead, Omar wrote the checks to Allen, and labeled many of them as "personal loans." *Id.* at 400. This suggests Allen could use them as he saw fit. *Id.* In summary, the bankruptcy court did not err in determining that Turbo failed to establish a misrepresentation by Allen.

The bankruptcy court also did not err in finding that Turbo failed to establish reliance. As stated above, to establish a claim under § 523(a)(2)(A), "the creditor must show . . . that the creditor actually and justifiably relied on the representation." *In re Acosta*, 406 F.3d at 372 (citing *In re Mercer*, 246 F.3d at 404). In this case, Turbo's only evidence of reliance was the testimony of Omar and Ernest. *See In re Borschow*, 454 B.R. at 389, 400. The Bankruptcy court did not find that testimony credible, and for good reason. *See id.* Omar wrote the checks to

Allen, and often labeled them as "personal loans." *Id.* If it was so important to Omar that Allen cover the overdrafts, Omar would have likely written the checks to BI, and thus required Allen to clear the overdrafts on the BI account when Allen deposited the check. *Id.*

In conclusion, the bankruptcy court did not err because Turbo failed to establish a misrepresentation and failed to establish reliance. Further, because both of these are necessary elements, the Court need not examine the other elements. The bankruptcy court's holding that Turbo cannot establish a claim under § 523(a)(2)(A) based on actual fraud is affirmed.

### 2.    False pretense or representation theory

Turbo argues in the alternative that the entire debt should be non-dischargeable under a false pretense or false representation theory. Turbo's Br. 10-12. The bankruptcy court held that Turbo cannot pursue a false pretense or representation theory because "promising to use the loan proceeds in a certain way in the future — does not describe a past or current fact." *In re Borschow*, 454 B.R. at 396-97.

Section 523(a)(2)(A) states that "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud" is non-dischargeable. 11 U.S.C. § 523(a)(2)(A). In the past, the Fifth Circuit has distinguished between false pretenses, a false representation, and actual fraud. *See In re Mercer*, 246 F.3d at 403; *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1292-93 (5th Cir. 1995); *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991). More recently though, the Fifth Circuit treated the three terms identically. *See In re Acosta*, 406 F.3d at 372 (5th Cir. 2005). However, in an unpublished opinion in 2007, the Fifth Circuit acknowledged that "[o]ur court has applied different, but somewhat overlapping, elements of proof for § 523(a)(2)(A) actual

25

fraud, as opposed to false pretenses/representation." *Jacobson v. Ormsby*, No. 06-51460, 2007 WL 2141961, at *2 n.2 (5th Cir. July 26, 2007) (quoting *In re Mercer*, 246 F.3d at 403).   Given the uncertainty in the case law, the Court considers Turbo's allegations of non-dischargeability under a false representation or false pretense theory even though all of these claims may have the same elements.

The Fifth Circuit in *Bercier* explained the distinction between false representations and pretenses on the one hand, and actual fraud on the other: a promise related to a future action is only actionable under an actual fraud theory, and not a false pretense or a false representation theory.   *See In re Bercier*, 934 F.2d at 692.   The idea is that a promise about a future action is not a statement about a past or current fact.   *See id.*; *Gilbert v. DeLeon (In re DeLeon)*, Bankruptcy No. 09-10310, 2011 WL 1435675, at *4-5 (Bankr. E.D. Tex. Apr. 14, 2011).   Accordingly, to establish a claim for false pretense or false representation under § 523(a)(2)(A), the creditor must show: (1) a knowing and fraudulent falsehood; (2) *describing past or current facts*; (3) that was relied upon by the other party.   *Pentecost*, 44 F.3d at 1292-93 (emphasis added).

Here, the bankruptcy court properly applied the case law when holding that the alleged promise by Allen to use the loan proceeds for specific purposes was not a false pretense or false representation.   Turbo argues that Allen "made a present tense representation that money lent would immediately be used" to pay off the SNB Loan and cover the overdrafts.   Turbo's Br. 11. Thus, Turbo suggests the representation was a current fact about what Allen intended or did not intend to do.   *See id.*   However, this argument fails because this was a promise about future actions — a promise to use the loan to pay off the SNB Loan and cover the overdrafts *after* receiving the money.   And the Fifth Circuit in *Bercier* explained that a promise about future

26

actions was not recoverable under a false pretense or false representation theory.  *See In re Bercier*, 934 F.2d at 692.

Moreover, even if the alleged promise was a statement about a current fact, Turbo still cannot meet the elements of § 523(a)(2)(A) because Turbo failed to establish reliance.  *See Pentecost*, 44 F.3d at 1292-93; *In re Bercier*, 934 F.2d at 692.  Under any of the § 523(a)(2)(A) theories — actual fraud, false representation, or false pretense — the creditor must show it justifiably relied.  *See Field*, 516 U.S. at 70, 73-75; *In re Acosta*, 406 F.3d at 372; *Pentecost*, 44 F.3d at 1292.  As explained in the analysis above regarding the actual fraud theory, Turbo failed to show reliance on either the alleged promise to pay off the SNB Loan or promise to cover the overdrafts.  This defeats Turbo's claim under § 523(a)(2)(A).

In conclusion, Turbo cannot establish a claim under a false representation or false pretense theory.  Accordingly, Turbo's appeal fails on this issue, and the bankruptcy court is affirmed.

## V.   CONCLUSION

For the reasons stated above, the Court **AFFIRMS** the rulings of the bankruptcy court.

**SO ORDERED**.

**SIGNED** on this 8th day of February, 2012.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE